[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. INTRODUCTION
In modern life, the multiple courses of the high Victorian dinner have been replaced by the meal on the run. The issues presented in this tax appeal involve the tax status of various orders of fast food. The distinctions that must be drawn call for a veritable Thomas Aquinas of the take-out counter. Should several items ordered at the same time be treated as one meal or multiple meals? When is the number of items ordered sufficiently large that the entire order is not for a meal at all but a bulk purchase of food? These are not trifling questions. Their resolution is of considerable importance both to the parties and to the fast food industry in general.
The plaintiffs, Kenneth, Edward, and David Jones operate Main Port Fish Chips ("Main Port") in Bridgeport. Main Port has ten tables, capable of seating thirty-five persons. It also sells a substantial amount of take-out food. Both eat-in and take-out customers place their orders at the counter. The customers order from a one page menu featuring fish, chips (these are "chips" in the British sense of the word; Americans would refer to them as french fries), scallops, shrimp, sandwiches, chowders, salads, desserts, and beverages. A cashier registers the order at a cash register.
The Department of Revenue Services ("DRS") conducted a sales and use tax audit of Main Port for the period September 1, 1988 CT Page 1412-H through August 31, 1991. Following the final decision of the DRS, the plaintiffs filed a timely appeal to this court. An evidentiary hearing was held, followed by briefing and extensive oral arguments. Four principal issues are presented: (1) procedural problems with the audit itself, (2) the distinction between "meals" and bulk food purchases, (3) problems involving a tax exemption applicable to meals costing less than two dollars that was in effect during part of the audit period, and (4) the interpretation of a tax exemption for sales of food products and meals to "patients" in homes for the elderly. These problems will be considered in turn. Additional findings of fact will be stated in conjunction with the issues to which they pertain.
II. THE AUDIT
In Constantine v. Commissioner, No. 390484 (May 23, 1994), the Court (Aronson, J.) stated that "[a] n honest and conscientious taxpayer who maintains required records has a right to expect that those records will be used in a complete audit." Id. at 17. The evidence establishes that the DRS auditors in this case did not consult Main Port's cash register tapes. It does not appear that the DRS was primarily at fault in this matter. The plaintiffs did not produce the tapes until the field stage of the audit had already been completed. There is, on the other hand, no evidence that the plaintiffs withheld the tapes in bad faith. The problem seems primarily attributable to the plaintiffs' disorganization.
If this were an administrative appeal governed by an abuse of discretion standard, I would not find that the DRS abused its discretion by failing to consult the tapes. Tax appeals, however, are trials de novo, and the court is not limited to a review of the evidence submitted below. The plaintiffs have now produced the tapes, and no bad faith on anyone's part can be found. At the same time, however, it is inappropriate for the court itself to conduct a new audit under the guise of a trial de novo. To put it bluntly, such an endeavor would not be within the area of judicial competence. As was the case in Constantine,
it is more appropriate to remand the case to the DRS for a redetermination of the taxpayer's sales tax liability based on all of the available evidence, including the now-available tapes. Such a remand is particularly appropriate in this case because, as will be seen, the audit position of the DRS employed some substantive legal errors as well. Because of these errors, a remand is required in any event. CT Page 1412-I
III. THE "MEAL"/"BULK PURCHASE" DISTINCTION
Connecticut's sales tax, like that of most states, is imposed on all sales of tangible personal property except those that are specifically exempted. See 2 Jerome R. Hellerstein 
Walter Hellerstein, State Taxation ¶ 12.05 (1992). One specified exemption pertains to "[s]ales of food products for human consumption." Conn. Gen. stat. § 12-412(13). This statute is of central importance in this case, and it will be helpful to quote it in full:
 Sales of food products for human consumption. "Food products" include cereals and cereal products, milk and milk products, oleomargarine, meat and meat products, fish and fish products, eggs and egg products, vegetables and vegetable products, fruit and fruit products, spices and salt, sugar and sugar products other than candy and confectionery; coffee and coffee substitutes, tea, cocoa and cocoa products other than candy and confectionery. "Food products" do not include spirituous, malt or vinous liquors, soft drinks, sodas or beverages such as are ordinarily dispensed at bars and soda fountains, or in connection therewith, medicines except by prescription, tonics and preparations in liquid, powdered, granular, tablet, capsule, lozenge and pill form sold as dietary supplements or adjuncts. "Food products" also do not include meals sold by an eating establishment or caterer. "Meal" means food products which are furnished, prepared or served in such a form and in such portions that they are ready for immediate consumption. A meal as defined in this subsection includes food products which are sold on a "take out" or "to go" basis and which are actually packaged or wrapped. The sale of a meal, as defined in this subsection, is a taxable sale. "Eating establishment" means a place where meals are sold and includes a restaurant, cafeteria, grinder shop, pizzeria, drive-in, fast food outlet, ice cream truck, hot dog cart, vending machine, refreshment stand, sandwich shop, private or social club, cocktail lounge, tavern, diner, snack bar, or hotel or boarding house which furnishes both lodging and meals to its guests.
CT Page 1412-J
Conn. Gen. Stat. § 12-412(13) (1991).[1]
The structure of this statute is rather complex. "[F]ood products for human consumption" constitute a specified exemption to the imposition of the sales tax. The general definition of "food products" contained in the first sentence of the statute encompasses almost every item of food, other than soft drinks, sold at a fast food restaurant. There is, however, an exception within this exception. "`Food products' . . . do not include meals sold by an eating establishment or caterer." "Meal" is a defined term. It means "food products which are furnished, prepared or served in such a form and in such portions that they are ready for immediate consumption." This definition specifically encompasses "food products which are sold on a `take out' or `to go' basis and which are actually packaged and wrapped."
The problem of bulk food purchases is not addressed in the statute. Indeed, the text of the statute gives no indication that the quantity in which food products are purchased should have any bearing on their tax status. Quantity is plainly unimportant when food products are sold by a grocery store or supermarket. A supermarket shopper need not be concerned about whether she purchases one apple or one hundred. Both purchases are purchases of "food products" and both are tax exempt.
As far as the statutory text is concerned, the tax status of food products sold on a "take out" basis by eating establishments is equally unaffected by the quantity sold. The statutory test is whether the food products sold "are furnished, prepared or served in such a form and in such portions that they are ready for immediate consumption." This test has nothing to do with quantity. A single hamburger purchased from McDonald's is plainly "ready for immediate consumption. "This is also the case with twenty hamburgers purchased at the same time. Of course, a single person is unlikely to eat twenty hamburgers at the same time unless that person is making a bid for the Guiness Book ofRecords.[2] But those twenty hamburgers remain ready for immediate consumption, and if they are transported to a child's birthday party with twenty hungry guests, they will, in fact, be immediately consumed. By this logic, all twenty hamburgers should be taxable. The same is true of buckets of chicken, cakes (large and small), boxes of donuts, and a wide variety of other fast foods. CT Page 1412-K
Unhappily, as Justice Holmes famously observed, the life of the law has not been logic. The DRS has enormously complicated this analysis by issuing an official bulletin, Bulletin #17, which declares that some fast foods may be sold in such quantity that they become (nontaxable) "bulk sales of food." The bulletin additionally attempts to distinguish between "meals" and "bulk sales of food" in a number of different fast food contexts. To complicate the matter further, two different versions of Bulletin #17 exist, governing different parts of the audit period. The first version (Version I) was issued in August 1987, prior to the commencement of the audit period. The second version (Version II) was issued in May 1990. Version II was the controlling version during roughly the second half of the audit period. Each of these versions must be described in some detail.
Version I
Version I has a section entitled "Bulk Sales of Food." That section reads in its entirely as follows:
 The sale of food items in bulk would not generally be considered the sale of a meal. Examples of exempt bulk food sales would include the sale of a half gallon of ice cream at an ice cream shop or a box of a dozen donuts at a coffee and donut shop.
 However, the sale of a hot pizza by a pizzeria or the sale of a large container of hot fried chicken or fish pieces by a restaurant is considered the sale of a meal and is subject to tax, if it costs $2.00 or more.
DRS Bulletin #17 at 2 (1987).
The section just quoted seems, for reasons already discussed, to be at variance with the statutory text. Both "a half gallon of ice cream" and "a box of a dozen donuts" are "ready for immediate consumption." Of course, it is unlikely that these items will be consumed by a single person,[3] but it is similarly unlikely that a single person will consume a large pizza or a bucket of chicken. Those latter purchases are still considered "meals." A box of a dozen donuts, in any event, is typically purchased to be shared with coworkers on the day of sale. It will be "immediately consumed" at the time of the first coffee break.
Because of its internal inconsistency and its significant CT Page 1412-L variance from the statutory text, Version I is not a particularly satisfactory guide to the "bulk sales" problem presented in this case. As will be seen, Version II does not constitute a significant improvement in this area. At argument, the question whether Bulletin #17 should be invalidated or ignored was presented to the parties. Both parties argued that the bulletin, for all its shortcomings, should be followed rather than ignored. The parties presented a significant prudential reason for this approach. Their point, essentially, is that Bulletin #17 serves as a practical guide for the fast food industry in Connecticut. This industry consists of hundreds, perhaps thousands, of retail establishments, many of which do high volume businesses with the help of a relatively young and uneducated workforce. In this situation, the parties submit, it is better to have a rough-and ready checklist of taxable items than the much more general guidance of the controlling statute.
After much consideration, I have concluded that Bulletin #17 must be followed in this case. My reasoning, however, is somewhat different from that of the parties. It is hornbook law that an administrative regulation has no validity if it conflicts with the governing statute. Austin v. Housing Authority,143 Conn. 338, 348-49, 122 A.2d 399 (1956). In this case, however, the validity of the regulation has not been challenged. "[O]rdinarily the validity of an administrative regulation can be challenged only by one directly harmed by its application."Goldberg v. Insurance Department, 207 Conn. 77, 83, 540 A.2d 365
(1988). Here, to the extent that Bulletin #17 is invalid, the plaintiffs have benefitted [benefited] from its application, since any invalidity of the bulletin consists in awarding a tax exemption for bulk sales of food unjustified by the controlling statute. In addition, there is evidence that the plaintiffs, at least to some degree, relied on Bulletin #17 during the audit period. It would plainly be unfair to punish them for such reliance. For those reasons, Bulletin #17, in its various manifestations, will be relied upon for purposes of this case. This decision should not, however, be construed as suggesting that Bulletin #17 would survive an appropriate challenge in a future case.
With this in mind, it is appropriate to return to the text of Version I. That version affirmatively states that "the sale of a large container of . . . fish pieces by a restaurant is considered the sale of a meal and is subject to tax." One of the specific questions presented by this case is whether the sale of a large order of fish is a "meal" or a "bulk sale." If CT Page 1412-M Bulletin #17 is to be considered controlling, such a sale must plainly be considered the sale of a "meal" for the period governed by Version I.
The status of two other items sold by Main Port is reasonably clear under Version I as well. First, Main Port treated sales of its "fish platter" and "mini platter" (the latter presumably being a small platter of fish) as "bulk sales." Neither of these characterizations is appropriate under Version I. The platters obviously consist of pieces of fish. If a "large container" of fish pieces is considered a meal, a fish "platter" is plainly a meal as well. Second, Main Port considered a serving of five stuffed clams to be a "bulk sale." This is closely analogous to a large container of fish pieces and should be considered a meal under Version I.
Three other items are more imponderable. Main Port also treated as "bulk sales" pints of chowder, pints of coleslaw, and large orders of fries. While these items present closer calls under Version I, any one of them could reasonably be consumed as a meal by a single person with a healthy but not necessarily gargantuan appetite. They are not in the same category as a half gallon of ice cream or a box of a dozen donuts. They should be treated as meals as well.
Version II
Version II is considerably more detailed than Version I, although, as will be seen, the specific treatment of "fish pieces" found in Version I is conspicuously absent in Version II. Here, again, it will be helpful to quote Version II at length:
 Meals include all food and beverage sold for consumption at the seller's location. Meals also include food products ordinarily sold in such form and portions that they are ready for immediate consumption on or near the location of the seller, including prepared foods, prepackaged foods, hot foods and foods heated on the premises for the purchaser. A meal may be a full dinner or it may be limited to a single item. Meals are subject to Connecticut Sales Tax whether they are served at the location of the seller, delivered to the purchaser's location or sold as a "take-out" order.
. . . . CT Page 1412-N
 The sale of food items in bulk is not generally considered the sale of a meal. Exempt bulk food items are those items sold in such form or in portions which are larger than those which are ordinarily considered for immediate consumption. For example, whole cooked chickens, racks of cooked ribs, whole loaves of bread, and whole cakes or pies are considered bulk food purchases and are, therefore, not taxable.
. . . .
 Examples of food for immediate consumption include, but are not limited to, the following:
 — Coffee or tea (ready to consume — hot or iced) — Sandwiches and grinders — Popsicles, ice cream cones, cups, sundaes, and other individual servings of frozen desserts unless sold in factory prepackaged multi-unit packs — Ice cream, frozen yogurt, and other frozen desserts sold in containers of less than one-pint. — Yogurt sold in containers 8 oz. or less unless sold in factory prepackaged multi -unit packs — Fountain drinks, shakes, syrup-flavored crushed ice drinks — Bottled or canned fruit juices and drinks, containers of milk, non-carbonated mineral or spring water sold in containers 12 oz. or less unless sold in factory prepackaged multi-unit packs. — Salads sold at salad bars — Salads sold in containers of less than one-half pound — Donuts, muffins, rolls, bagels, pastries (5 or fewer) — Cookies (sold 5 or fewer or sold less than one-half pound) — Pies or cakes by the slice — Bags or packages of chips, popcorn, nuts, trail mix, crackers, cookies, snack cakes, or other snack foods sold 5 oz. or less. — Single pieces of fruit — Pizza sold whole or sliced — Cooked chicken sold by the piece, including "buckets" of chicken
*Items sold in quantities or portions which are larger CT Page 1412-O than those noted above are considered to be bulk sales and, therefore, are not generally considered to be taxable as meals.
DRS Bulletin #17 at 1-2 (1990).
As mentioned, the specific treatment of "fish pieces" in Version I is omitted in Version II. Version I stated that "a large container of hot fried chicken or fish pieces" is a "meal." Version II states that "[c]ooked chicken sold by the piece, including `buckets' of chicken" is a "meal."
Because "fish pieces" are no longer specifically treated in Version II, they must be dealt with by more general principles. Such general principles are, unhappily, somewhat difficult to identify in Version II. The most helpful general principle appears to be that of the last sentence. Quantities or portions larger than those specifically itemized are considered to be bulk sales.
The problem with the principle just stated is that the portions specifically itemized in Version II have no common size. Most of the portions listed are those that would be consumed by a single person of moderate appetite at a single sitting: a sandwich, for instance, or a slice of pie or a single piece of fruit. Some portions, however, appear decidedly larger. Only a real trencherman is likely to eat five donuts at a sitting, and consumption of five cookies at a sitting is presumably unusual, although many people do it on occasion. When it comes to whole pizzas and entire buckets of chicken, we are again in what may be termed trencherman territory. And the basic problem of inconsistency remains. Two apples are a far more modest (not to mention more healthful) meal than a whole pizza. Yet the pizza is considered a "meal" and the apples are not.
There is no perfectly satisfactory answer to this problem. The specific items listed in Version II are plainly controlling with respect to the items actually named. Beyond that, the general principle applicable to most (although assuredly not all) items is that a portion likely to be consumed by a person of moderate appetite at a single sitting is a "meal" and that any larger quantity is a "bulk sale."
Application of this general principle is itself a matter of judgment. There is evidence that each piece of fish sold by Main CT Page 1412-P Port weighs one-half pound. On the whole, it seems reasonable to conclude that a person of a moderate appetite could reasonably consume two such pieces of fish at a sitting. By the same test, however, sales of three pieces of fish or more must be considered "bulk sales" under Version II.
The strength of this conclusion is underlined by the fact that Version II specifically declines to treat buckets of fish in the same category as buckets of chicken. While this, of course, makes little sense, it has already been noted that Version II is not conspicuous for its logic. Fish pieces must be treated according to the more general principle discussed above.
One item in contention is covered by a specific item listed in Version II. "Salads sold in containers of less than one-half pound" are considered "meals." One of the items in contention here is pints of coleslaw. Coleslaw is a salad. ("Slaw" is derived from the Dutch word "sla," meaning "salad." Webster'sThird New International Dictionary 443 (1961).) Keeping in mind the ancient maxim that a pint's a pound the world round, it is likely that a pint of coleslaw weighs more than one-half pound. A pint of coleslaw is, consequently, a "bulk sale."
Chowder, fries and stuffed clams are not included in the specific items listed in Version II. They must be judged by the general principle identified above. Although one cannot be completely confident in such matters, it is reasonable to conclude that, considering each order individually, a pint of chowder, a large order of fries, and five stuffed clams are all portions that could reasonably be consumed by a single person of moderate appetite at a single sitting. All of these are, consequently, "meals."
In conclusion, none of the items treated as "bulk sales" by Main Port can properly be treated as bulk sales under Version I. Version I, however, can be considered as controlling only until May 1, 1990, when it was replaced by Version II. Under Version II, sales of three pieces of fish or more and pints of coleslaw are bulk sales. The DRS erred in not treating them as such. The other items in contention, discussed above, were properly treated as "meals" by the DRS.
IV. THE MEAL COSTING LESS THAN TWO DOLLARS EXEMPTION
At the beginning of the audit period, Conn. Gen. Stat. § CT Page 1412-Q12-412(51) exempted from the sales tax meals costing less than two dollars. This subsection stated as follows:
 Any meal the cost of which is less than two dollars.
The sale of any meal, as defined in subsection (13) of this section, for which the purchaser is charged a total of less than two dollars. The exemption provided herein shall apply to the total charge for each such meal separately computed. The gross receipts from all such meals costing less than two dollars shall be exempt from the tax imposed by this chapter, provided the retailer claiming such exemption shall maintain adequate records to support the same. If records are not adequate for purposes of such exemption, as determined by the commissioner of revenue services, such gross receipts shall be subject to tax under this chapter.
Conn. Gen. Stat. § 12-412 (51) (1989). The definition of "meal" in § 12-412 (13) has already been discussed. At the beginning of the audit period, that definition contained certain references to subsection (51) that have since been deleted. The original definition of "meal" was as follows:
 "Meal" means food products which are furnished, prepared or served in such a form and in such portions that they are ready for immediate consumption, provided any meal exempt from tax in accordance with subsection (51) of this section may include any nonalcoholic beverage which is not a food product, as that term is defined in this subsection, if such meal includes food products in addition to such nonalcoholic beverage. A meal as defined in this subsection includes food products which are sold on a "take out" or "to go" basis and which are actually packaged or wrapped. The sale of a meal as defined in this subsection, subject to the exemption allowed under said subsection (51) of this section, is a taxable sale.
Conn. Gen. Stat. § 12-412 (13) (1989). Both subsection (51) and the references to it contained in subsection (13) were deleted by 1989 Conn. Acts 89-251 §§ 13 202, making this at once a case of first and last impression. The 1989 act took effect July 1, 1989. Id. § 203. CT Page 1412-R
The problem in this case has arisen because Main Port treated each individual item rung up on its cash registers as a "meal." Thus, to take one example, if a hypothetical customer ordered a cup of chowder, a small order of fries, and a stuffed clam, each of these items would be considered a "meal." Suppose that the cost of each of these items was $1.00. In spite of the fact that the total cost of these items is $3.00, Main Port treated this purchase as a purchase of three "meals," each costing less than $2.00. The question presented is whether this treatment was appropriate.
A sensible analysis of this problem must acknowledge cultural as well as legal considerations. In many households, "meals" are somewhat formal affairs, involving several items of food, often served in two or three courses. In such a household, a single order of fries would hardly be considered a "meal." In fact, however, the concept of a "meal" is an elastic one, varying from time to time and culture to culture.
A helpful place to begin, if only for purposes of contrast, is the high Victorian meal. According to Miss Manners, the proper meal of a century ago had fourteen courses. She offers the following as a "basic list":
 1. Oysters or clams on the half shell. Fruit or caviar may be served instead. 2. Soup, giving each guest a choice of clear or thick. 3. Radishes, celery, olives, and salted almonds. 4. Fish, served with fancifully shaped potatoes and cucumbers with oil and vinegar. 5. Sweetbreads or mushrooms. 6. Artichokes, asparagus, or spinach in pastry. 7. A roast or joint, as we say, with a green vegetable. 8. Frozen Roman punch, to clear the palate and stimulate you to go on. 9. Game, such as wild duck or little birdies, served with salad. 10. Heavy pudding or another creamed sweet. 11. A frozen sweet. It is a nice touch to have tiny crisp cakes with this. 12. Cheeses, with biscuits and butter. Or you may serve a hot savory of cheese, which is more filling. 13. Fresh, crystallized, and stuffed dried fruits, CT Page 1412-S served with bonbons. 14. Coffee, liqueurs, and sparkling waters.
Judith Martin, Miss Manners' Guide to Excruciatingly CorrectBehavior 492 (1982).
In modern times, this list is more amusing than instructive. If nothing else, it helps to explain the prodigious girth of nineteenth century Supreme Court justices that one sees in old photographs. It should be clear, however, that Miss Manners' list cannot possibly define what a "meal" is for purposes of modern Connecticut tax law. If it did, the statutory exemption for meals costing less than two dollars would be meaningless, for no such "meal" could possibly cost less than two dollars in the first place.
The other end of the gastronomic spectrum must now be examined. If a meal need not be an elaborate affair to be a "meal" for statutory purposes, just how minimal may an item of food be and still qualify as a "meal"? Courts have struggled with this problem since the end of the Victorian era. An early case from New York is illustrative of the problems faced by courts in interpreting statutory terms in light of contemporary habits.
A nineteenth century New York statute allowed hotels to sell liquor to their guests on Sunday with their "meals." The guests, it turns out, were more interested in liquor than in food. What was the minimum amount of food that could be served to a guest that would allow an accompanying sale of liquor? A Coney island hotel served a sandwich with a drink of whiskey. In In reCullinan, 87 N.Y.S. 660 (N.Y.App.Div. 1904), the Appellate Division of the New York Supreme Court held that, in the particular case before it, this had been simply a ruse since the sandwich in question had not been served in good faith. If the sandwich had been served in good faith, however, the Court indicated that a different result would obtain. It explained that:
 There can be no reasonable doubt that under some circumstances a sandwich and a drink of whisky or other beverage constitute a meal, under our modern Bohemian system of living. Many men in clubs, at restaurants, and elsewhere confine their eating at certain periods of the day to a single dish — to a bowl of soup, to a CT Page 1412-T plate of beans, or a sandwich — and there is no particular kind or quantity of food which the law demands for a meal, so far as we have been able to discover; it all depending upon the person to be served and the condition of his appetite. . . . [I]t is not the duty of the respondent to inquire diligently into the motives which actuate those who frequent his premises. He has a right, in the absence of knowledge to the contrary, to assume that one who comes into his place and orders a sandwich or any other article of food does so because he desires the nourishment which it affords; and, if a single sandwich satisfies the desires of the person, it constitutes a meal, and the keeper of a hotel has the right to serve liquors to him with such meal.
87 N.Y.S. at 661-62.
In Treasure Island Catering Co. v. State Board, 120 P.2d 1
(Cal. 1941), the California Supreme Court disagreed with this minimal conception of the term "meal." The California sales tax, like our own, exempted the sale of "food products." This exemption, however, was inapplicable to the sale of "meals." A sandwich stand sold hot dogs and hamburgers. Were these "meals"? The California court held that they were not. It explained that:
 The generally accepted concept of a meal is that it not only consists of a larger quantity of food than that which ordinarily comprises a single sandwich, but that it usually consists of a diversified selection of foods which would not be susceptible of consumption in the absence of at least some articles of tableware and which could not conveniently be consumed while one was standing or walking about.
120 P.2d at 4.
This gastronomic debate was not, however, at an end. InDepartment of Revenue v. To Your Door Pizza, Inc., 670 S.W.2d 482
(Ky.Ct.App. 1984), the Kentucky Court of Appeals found theTreasure Island concept of a "meal" to be outmoded in modern times. The Kentucky sales tax, like that of California, exempted the sale of food products but did not exempt the sale of "meals." was a pizza delivered "to your door" a "meal"? The Kentucky court found that it was. It explained that: CT Page 1412-U
 [O]ne no longer must "dine" to have a "meal." Today's customs would allow many single items to be considered a "meal." In today's world, a hot dog or hamburger and a soft drink frequently make a meal. Also, a sandwich can be a meal whether it is consumed standing up, sitting at a desk, perched on a steel girder, or while lunching at the Ritz.
670 S.W.2d at 484.
If anything, our nation's gastronomic habits have become even less formal in the twelve years since To Your Door Pizza was decided. To the extent that contemporary cultural standards provide a guide, an order of fries or a stuffed clam can readily qualify as a "meal."
In Connecticut, the term "meal" is statutorily defined. It means "food products which are furnished, prepared or served in such a form and in such portions that they are ready for immediate consumption." Conn. Gen. Stat. § 12-412(13). Both Version I and Version II state that, "A meal may be a full dinneror it may be limited to a single item." Version I at 1; Version II at 1. (Emphasis added.) Any particular item — whether it be an order of fries, a stuffed clam, or a piece of fish — sold by Main Port plainly qualifies as a "meal" under this definition. If a customer orders three such items, it is consistent with the statute to treat such a purchase as a purchase of three "meals."
An important canon of statutory construction must be considered as well. It is well established that "[i]f a statute that imposes a tax is ambiguous either on its face or in its application, a taxpayer is entitled to a construction in its favor; conversely, a statute providing for a tax exemption must be construed in favor of the state." Altray Co. v. Groppo, R224 Conn. 426, 432, 619 A.2d 443 (1993). The structure of Conn. Gen. Stat. § 12-412(13) must be carefully examined with this maxim in mind. On its face, § 12-412(13) is a tax exemption statute and must be construed in favor of the state. The actual tax exemption, however, is for "food products." Subsection (13) also contains an exemption from this exemption — an unexemption, as it were. That unexemption is for "meals." The result of this unexemption is that "meals" are affirmatively taxed. Functionally, the unexemption for "meals" is a tax imposition CT Page 1412-V statute. To the extent that it is ambiguous, it must be construed in favor of the taxpayer.
This analysis is complicated by the fact that Conn. Gen. Stat. § 12-412(51) grants a tax exemption for meals costing less than two dollars. On its face, this is a tax exemption statute and must be construed in favor of the state. Subsection (51), however, incorporates by reference the definition of "meal" contained in subsection (13). The definition of "meal" must be the same for purposes of each subsection. Consequently, the term "meal," to the extent that it is ambiguous, must be defined in favor of the taxpayer. This approach provides another reason for treating each individual item sold by Main Port as a "meal" for statutory purposes.
For these reasons, Main Port was correct in treating the individual items it sold as "meals" for purposes of Conn. Gen. Stat. § 12-412(51). The DRS erred in not treating them as such.
V. SALES TO "PATIENTS" IN NURSING HOMES
The final issue presented by this case involves a tax exemption set forth in Conn. Gen. Stat. § 12-412(9). That subsection reads in its entirety as follows:
 (9) Educational institution and certain health and care facility meals. Sales of food products and meals in a student cafeteria, dining-hall, dormitory, fraternity or sorority maintained in a private, public or parochial school, college or university, to members of such institutions or organizations and sales of food products and meals to patients in hospitals, homes for the aged, convalescent homes, nursing homes and rest homes.
Main Port sold food to residents of homes for the aged, nursing homes, and rest homes. The problem in this case has arisen because it treated all sales to any resident of such an institution as tax exempt. The particular level or kind of care that the resident received was not considered. The DRS disallowed an exemption for these sales, apparently claiming that the statutory term "patients" extends only to those residents of nursing homes shown to be receiving some kind of medical care.
The position of the DRS cannot be sustained. People do not CT Page 1412-W go to nursing homes for recreational purposes. They go there as a last, often desperate, resort because they are too sick or infirm to live on their own. The heading of subsection (9) itself states that these are "care" facilities. Nursing homes are licensed under chapter 368v of the General statutes as "health care institutions." The terms "home for the aged," "nursing home," and "rest home" are defined by our licensing statute as establishments providing "services which meet a need beyond the basic provisions of food, shelter and laundry." Conn. Gen. Stat. § 19a-490(c). The need that these institutions meet is a need for care.
The level of care required by residents of nursing homes will plainly vary from one resident to another. Some residents will be under the direct care of a physician or nurse. Others will be cared for by attendants. Still others will simply have someone checking on them from time to time. All of these residents, however, are receiving, at least in theory, the actual level of care that they need. See state ex rel. AvonConvalescent Center. Inc. v. Bates, 341 N.E.2d 296, 298 (Ohio 1976). It is reasonable to refer to all of them as "patients." Id.
A practical concern is important as well. The legislature in drafting § 12-412(9) could hardly have intended to distinguish between residents of nursing homes depending on the level of care that they receive. The difficulty involved in drawing the line demonstrates the futility of the exercise. Should a resident who sees a doctor once a week be entitled to tax free meals and a fellow resident who sees a doctor once a month be denied the same treatment? What about a third resident who sees a doctor once a month but must constantly be assisted by attendants? And how is a food vendor to make these determinations? Must the delivery person check the medical records of each resident? It is plainly more sensible, and more realistic, to recognize that all residents of nursing homes require care and that all are "patients" for purposes of subsection (9).
The DRS has raised additional questions concerning the documentation of these sales. For the reasons discussed in Part II of this opinion, however, this case must be remanded for additional administrative proceedings in light of the evidence now available. Questions concerning documentation are best addressed, at least as an initial matter, in that forum. CT Page 1412-X
VI. OTHER CLAIMS
The plaintiffs have raised two additional claims that can be much more summarily considered.
Although the plaintiffs have not formally presented it as an issue, they claim in their statement of facts that their reported gross receipts for five of the months involved in the audit contain mathematical errors. These are errors committed by the plaintiffs themselves. The claim of error was first raised at the time of trial. The record contains no indication that any claim for a refund has been filed with the Commissioner. Conn. Gen. Stat. § 12-425(2) expressly requires that such a claim be filed in the event of overpayment. Because no claim has been filed, this issue cannot be considered by the judicial authority on review. For the same reason, the statute of limitation defense raised by the DRS need not be considered at this time.
The plaintiffs also claim equitable relief under Conn. Gen. Stat. § 14-222. It is, however, axiomatic that judges must act according to law. The relief granted in this decision is the full measure of relief that the law authorizes. No additional equitable relief is appropriate under the circumstances.
VII. CONCLUSION
The plaintiff's appeal is sustained. The case is remanded to the DRS for further proceedings in accordance with this opinion.
Jon C. Blue Judge of the Superior Court